In The
Court of Appeals
For The
First District of Texas
____________

NO. 01-01-00697-CR
____________

GARY ALAN DASHIELD, JR., Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 228th District Court 
Harris County, Texas
Trial Court Cause No. 839,088




DISSENTING OPINION EN BANC
          I respectfully dissent. In my view, the majority fails to conduct the neutral
review of all the evidence as required by the standard of review. Instead, it adopts a
highly deferential standard of review under which the trier of fact is free to disregard
unrebutted and uncontroverted evidence of insanity and to reject the insanity defense
when there is no evidence from which a rational trier of fact could conclude that
appellant was legally sane at the time of the offense. Since, under Article V, section
6 of the Texas Constitution


, the Court of Criminal Appeals lacks jurisdiction over
factual determinations, the decision of the intermediate court of appeals regarding
factual sufficiency of the evidence of insanity is conclusive. It is, therefore, critical
that we apply the correct standard of review.
          Fact-Finder’s Role
          Insanity is an affirmative defense. Tex. Pen. Code Ann. § 8.01 (Vernon
2003). The defendant bears both the burden of proof and the burden of persuasion.
Meraz v. State, 785 S.W.2d 146, 150 (Tex. Crim. App. 1990); Taylor v. State, 856
S.W.2d 459, 461 (Tex. App.—Houston [1st Dist.] 1993), aff’d, 885 S.W.2d 154 (Tex.
Crim. App. 1994). The purpose of the insanity defense is to determine whether the
accused should be held responsible for the crime, or whether his mental condition
excuses him from such responsibility. Graham v. State, 566 S.W.2d 941, 948 (Tex.
Crim. App. 1978); Taylor, 856 S.W.2d at 468. The question of insanity should focus
on whether the defendant understood the nature and quality of his action and whether
it was an act he ought or ought not to do. Bigby v. State, 892 S.W.2d at 878 (Tex.
Crim. App. 1994).
          The majority correctly states that “[a] defendant cannot be convicted of a
criminal offense if he is legally insane at the time of the crime” and that the essential
question is “whether ‘at the time of the conduct charged’ the defendant, ‘as a result
of severe mental disease or defect, did not know that his conduct was wrong.’” See
Tex. Pen. Code Ann. § 8.01(a). It acknowledges that in examining the factual
sufficiency of the evidence relevant to the defendant’s affirmative defense of insanity,
we must determine whether the judgment is so against the great weight and
preponderance of the evidence as to be clearly wrong. Zuliani v. State, 97 S.W.3d
589, 593 (Tex. Crim. App. 2003). It also states correctly that “[t]he issue of insanity
lies within the province of the jury (or, as here, the judge as sole fact-finder) to
decide, not only as to the credibility of witnesses and the weight of the evidence, but
also as to the limits of the defense.” Bigby, 892 S.W.2d at 878. What the majority
does not state is that, while the limits of the defense are left to the jury, the jury must
adhere to a standard of “reasonable belief.” Graham, 566 S.W.2d at 952 n.3 (citing
Tex. Pen. Code Ann. § 8.02(a) (Vernon 1994)).


 The facts may not be “resolved to
one end of the spectrum outside the realm of discretion.” Graham, 566 S.W.2d at 952
n.3. Nor does the majority clarify the requirement that, in conducting a review of the
rejection of the affirmative defense of insanity, we are required to consider all the
evidence relevant to the defense in a neutral light to determine whether the finding
against the affirmative defense, although adequate if taken alone, is so against the
great weight and preponderance of the evidence as to be clearly wrong. See Zuliani,
97 S.W.3d at 593; Bigby, 892 S.W.2d at 875.
          Prior decisions of both the Court of Criminal Appeals and this and other
appellate courts have set out guidelines for proof of the insanity defense. Although
the defense is expressed in terms of a “mental disease or defect,” the issue is not
strictly medical; it invokes ethical and legal considerations as well. Bigby, 892
S.W.2d at 877; Graham, 566 S.W.2d at 948; Taylor, 856 S.W.2d at 468. A defendant
may be insane from a medical standpoint by reason of a mental disease or defect, yet
not be exonerated or excused for a crime committed in that condition unless his
mental condition has reached the point where he is unable to distinguish right from
wrong. Graham, 566 S.W.2d at 948; Taylor, 856 S.W.2d at 468. In deciding whether
the abnormal mental condition of the accused excuses criminal responsibility, the jury
is not restricted to medical theories of causation, since the “result” requirement of
causation encompasses an ethical component. Graham, 566 S.W.2d at 953.
          While it has been suggested that expert testimony is necessary to establish the
“mental disease or defect” element of the insanity defense, the Court of Criminal
Appeals has rejected that view. Pacheco v. State, 757 S.W.2d 729, 733-37 (Tex.
Crim. App. 1988). Because the issue of insanity is not strictly medical, but also
invokes legal and ethical considerations, expert witnesses do not dictate the
determination of that issue. Bigby, 892 S.W.2d at 877; Graham, 566 S.W.2d at 949;
Taylor, 856 S.W.2d at 468-69. Nor is it always necessary for the State to present
expert medical testimony that a defendant is sane to rebut defense experts. Schuessler
v. State, 719 S.W.2d 320, 329 (Tex. Crim. App. 1986); Graham, 566 S.W.2d at 950;
Taylor, 976 S.W.2d at 352. 
          However, while a jury may not give conclusive effect to the opinion of an
expert merely because that opinion is not challenged by some other expert, it also
may not “arbitrarily disregard” expert testimony. Graham, 566 S.W.2d at 950 (citing
United States v. Fortune, 513 F.2d 883, 889 (5th Cir. 1974)); see also Brock v. United
States, 387 F.2d 254, 256 (5th Cir. 1967) (observing, “We are not unmindful of the
many cases holding that expert testimony, particularly that of psychiatrists, may be
adequately rebutted by the personal opinions of laymen. At the same time, the
opinions of experts may not be arbitrarily ignored, and reversal has been occasioned
by insufficient evidence of sanity.”).
          Not only lay and medical opinion, but also the circumstances of the crime are
important in determining the mental state of the accused at the time of the offense. 
See Pacheco, 757 S.W.2d at 733; Graham, 566 S.W.2d at 951. By accepting and
acknowledging that his action was illegal by societal standards, for example, a
defendant indicates his understanding that others believed his conduct was wrong. 
Graham, 566 S.W.2d at 951. Attempts to conceal incriminating evidence or to elude
officers can indicate the defendant’s knowledge of guilty conduct. Id. Other relevant
factors may include lay testimony regarding the lucidity of the defendant before the
commission of the crime; testimony regarding other possible motives for committing
the crime; other explanations for erratic behavior; attempts to eliminate witnesses;
and expressions of regret and fear of the consequences. Torres v. State, 976 S.W.2d
345, 352 (Tex. App.—Corpus Christi 1998, no pet.).
          Evidence Regarding Sanity
          Here, the majority’s recitation of the facts omits any reference to the report
introduced into evidence and testified to by Dr. Laval, the court-appointed expert who
testified at trial. Dr. Laval based his opinion that appellant was insane at the time of
the offense in part on an interview he conducted with appellant eight days after the
assault on the complainant in the state mental hospital to which appellant had been
committed two days later. Dr. Laval’s report reflects that appellant had a history of
previous psychotic episodes, including the one for which he was committed two days
after the assault—running naked down the freeway. Dr. Laval testified repeatedly
and unequivocally that appellant was insane at the time of the offense—i.e., that he
was unable to tell right from wrong. Dr. Laval was equally certain in his testimony
that appellant was not feigning mental illness or malingering. 
          Dr. Laval testified that, when examined in the psychiatric hospital shortly after
the incident, appellant reported that he saw a lady in pink go into the convenience
store. Appellant followed her and asked the lady at the store if she had seen a lady
in pink. She said “no”; but voices told him that the lady in pink was hiding in the
back office, waiting to shoot at him with a shotgun. Appellant left and walked
towards some apartments; but he was stopped by the voices who told him to get a
brick and “go back and pump fake, like I was going to throw the brick at her.” The
voices also told him to hit the cashier, explaining that she was a martial artist and
worked for the CIA and that the lady in pink was also with the government. 
Appellant told Dr. Laval that he somehow knew they were also involved with the Ku
Klux Klan and were responsible for his uncle’s death. The voices told him to wait
in line until it was his turn at the register. As he waited, he felt the cashier was the
enemy of the state. He threw the brick at her because he saw her moving and was
afraid of where the lady with the shotgun was. After hitting the complainant with the
brick, he left the store and went walking around.
          The State offered no rebuttal evidence—either expert or lay—on appellant’s
mental condition at the time of the offense. The only evidence of appellant’s mental
condition at that time of the offense was the insanity report, and Dr. Laval’s expert
opinion that appellant was unable to differentiate between right and wrong at the time
of the offense, an opinion based on his interview with appellant and his extensive
experience as a forensic psychiatrist in the psychiatric unit of the jail and court-appointed consultant on the assessment of inmates’ competency and sanity. Neither
the complainant nor the arresting officer offered an opinion as to whether appellant
knew the difference between right and wrong at the time of the offense, other than
complainant’s testimony that he looked “a little bit crazy.” Neither testified to
circumstances that indicated appellant was sane at the time of the offense.
          On appeal, instead of relying on rebuttal evidence of sanity, the State relied
principally on four statements made by Dr. Laval at trial to support its argument that
the trial court’s judgment was not against the great weight and preponderance of the
evidence; and the majority bases its conclusion of the factual insufficiency of
appellant’s insanity defense primarily on these purported “conflicting and
inconclusive statements.” When these statements are examined in the larger context
of the questions and answers surrounding them, however, they fail to support the
State’s position or the majority’s inference that Dr. Laval’s testimony was either
“conflicting” or “inconclusive.”
          First, the majority states that, after he was shown the videotape of the assault
at the trial, Dr. Laval acknowledged that the behavior he saw in the video “is not
consistent with anybody who suffers from schizophrenia or any other major disorder. 
Most people who suffer from a mental illness do not commit this type of offense. So,
it has nothing to do with a mental illness.” However, Dr. Laval continued, “If the
question is: Having viewed the actions that he [appellant] was engaged at the time
of the commission of the offense, did I come to a conclusion that maybe he was not
insane? I can answer that. No, that didn’t change my opinion.” Dr. Laval explained,
shortly before this testimony, that the videotape cannot show “what it is that
[appellant]’s responding to internally. We, of course, have no access to any voices
or delusions that he may have experienced.” Afterwards, in response to the court’s
question, “After seeing the event, what is your opinion as to what the mental illness
was the day of the alleged offense?,” Dr. Laval responded:
To make sure that I understand the question and so my answer will be
in that context, I do not think that the incident depicted in the tape will
give us information about what type of mental illness the defendant was
suffering. But I can say that the defendant suffers from a psychotic
illness or an illness that reaches psychotic proportions. And that it is
very probably a schizophrenic disorder that he suffers from that needs
treatment and needs treatment on an ongoing basis.

          Second, the majority describes Dr. Laval as being uncertain about the exact
time frame in which appellant knew right from wrong. The exchange, however,
makes it clear that the State was attempting to elicit testimony as to whether Dr. Laval
had an opinion that appellant should not be held criminally responsible. Dr. Laval
testified as follows:
I am not the one who says he should not be held criminally responsible.
That is the law. . . . In other words, the law says those who are found
insane are not guilty by reason of insanity. I can only render an opinion
that I, as a psychologist, believe he was insane. He was exhibiting
symptoms of a mental illness of sufficient severity that stopped him
from being able to differentiate right from wrong. 

          When the State then asked, “[H]ow long do you think it had been going on that
he didn’t know the difference between right and wrong?,” Dr. Laval responded, “The
important question there is – the important part of the question to me is whether he
knew right from wrong is only related to an actual act that he may have committed.
. . . Insanity or sanity is in reference to a particular act, not in reference to just any
type of psychiatric condition. So I couldn’t tell you.” 
          Dr. Laval explained that if appellant had been charged with running out naked
on the streets as he did days after the alleged offense and somebody asked Dr. Laval
if appellant was sane at the time, “I probably would have come to the opinion that at
the time he was not. That he did not know right from wrong. In fact, he thought he
was doing something right, cleansing his soul by getting naked.” Dr. Laval had just
testified that, at the time of the offense, appellant “was exhibiting symptoms of a
mental illness of sufficient severity that stopped him from being able to differentiate
right from wrong.”
          Third, when asked if it was “in the realm of possibility” or “possible” that
appellant was “just plain mean,” Dr. Laval answered that it was. The State then
asked, “But would that be in the context of a – we call it a psychotic episode?” Dr.
Laval replied, “[T]here are individuals who are just purely mean. . . . Then we have
individuals who may act in a very mean way. But because of their mental illness,
they were insane at the time. And it is my opinion that this is what happened with
this defendant.”
          Finally, the State and the majority point to the fact that Dr. Laval
acknowledged that there was a dispute concerning appellant’s exact diagnosis—i.e.,
whether he suffers from schizoaffective disorder, bipolar disorder, manic depression,
schizophrenia, or a combination thereof. However, Dr. Laval made it clear that the
common denominator is psychotic systematology, regardless of the precise cause of
appellant’s psychosis. Although the State and the majority describe this testimony
as “conflicting” and “inconclusive,” the precise medical diagnosis of appellant’s
condition is irrelevant to whether he was symptomatic at the time of the incident. See
Graham, 566 S.W.2d at 951. Dr. Laval consistently testified that appellant was
insane and unable to tell right from wrong at the time of the offense. Dr. Laval also
acknowledged that not all people who are mentally ill are necessarily insane at the
time of an offense. However, it does not follow from the fact that some mentally ill
people are legally sane at the time they commit an offense that appellant was legally
sane. Id. Dr. Laval did not change his opinion that appellant was insane at the time
of the offense.
          In short, the State did not elicit any evidence of appellant’s sanity from Dr.
Laval’s testimony; nor was there evidence from any other source of appellant’s sanity
at the time of the incident. The State did not offer expert or lay witnesses who
testified as to appellant’s sanity or who rebutted any of Dr. Laval’s testimony. The
only evidence as to appellant’s motivation, other than the complainant’s testimony
that appellant looked “a little bit crazy,” is Dr. Laval’s testimony regarding his
interview with appellant, which expresses a mental state entirely consistent with the
complainant’s testimony and the videotape, as well as with legal insanity.
          The circumstances of the crime were also ignored by the trial court and the
majority. No evidence was presented of possible motives for appellant’s behavior or
explanation for his behavior other than insanity; there was no testimony on
appellant’s motivation from Officer Waters; and the videotape, as Dr. Laval testified,
was incapable of showing motivation. Although the circumstances of the crime are
always important in determining the mental state of the accused at the time of the
offense, the circumstances in this case—appellant’s “little bit crazy” look, his
question about the “lady in pink,” his unprovoked threat that “you’re going to go
down,” his return to the store, his approaching the store repeatedly before going in,
his pacing and waiting in line, his feinting with the brick, his unmotivated attack on
the complainant—fail to support a reasonable inference of sanity. 
          Moreover, appellant did not confess, attempt to eliminate witnesses or
evidence, flee from the police, express guilt or remorse, have a motivation to harm
the complainant, or take any steps that indicated he knew his conduct was
wrong—acts that are considered evidence that a defendant was sane. See Schuessler,
719 S.W.2d at 330 (holding that evidence that defendant disposed of body near
border check-point suggested he knew his acts were wrong, and testimony of several
lay witnesses that defendant’s conduct did not indicate insanity supported jury’s
rejection of insanity defense). Torres, 976 S.W.2d at 347-48;


 Taylor, 856 S.W.2d
at 470.
          There is literally no evidence that appellant knew the difference between right
and wrong at the time of the offense, while there is unrebutted testimony from Dr.
Laval, based on his interview with appellant and his experience, that he did not. Nor
is there anything in the circumstances to indicate that appellant knew or contemplated
the difference between right and wrong at the time of the offense. There is nothing
in the record to rebut or controvert a finding of insanity. Moreover, there is no basis
for imputing to the trial court a finding that Dr. Laval’s testimony is not credible. As
the majority acknowledges, Dr. Laval has been a forensic psychiatrist working in the
psychiatric unit of the Harris County jail and is “often appointed by the court to assess
inmates for whom it has ordered competency and sanity evaluation”; he has been a
consultant for the Department of Mental Health and Mental Retardation since 1985
with regard to competency and sanity at the jail; and he testified that, in his opinion,
it is only in “very, very, very few occasions—less than one in a thousand—that a
person would justifiably be found insane at the time of the alleged offense.” It is
difficult to see in the trial court’s, and the majority’s, rejection of Dr. Laval’s
testimony anything other than the “arbitrary disregard” of expert testimony
condemned by the Court of Criminal Appeals in Graham. 566 S.W.2d at 950; see
also Fortune, 513 F.2d at 889; Brock, 387 F.2d at 256.
          The relevant evidence leads to only one conclusion—appellant did not know
the difference between right and wrong when he assaulted the complainant. The
judgment of the trial court is, in my view, not only against the “great weight and
preponderance” of the evidence, when all of the evidence is viewed in a neutral light;
it is entirely unsupported by any evidence and is contrary to the only relevant
evidence. There were no factual issues for the trial court to resolve. Thus, the factual
determination made by the trial court in rejecting appellant’s insanity defense was
“resolved to the far end of the spectrum” and was “outside the realm of discretion”
accorded the fact finder, contrary to the standard of proof of factual sufficiency
established by the Court of Criminal Appeals. See Graham, 566 S.W.2d at 952 n.3. 
Consequently, the finding of the “vital fact” of sanity by the trial court was “so
contrary to the great weight and preponderance of the evidence as to be clearly
wrong.” Zuliani, 97 S.W.3d at 593.
          This case is startlingly similar to Van Guilder v. State, 709 S.W.2d 178 (Tex.
Crim App. 1985), overruled on other grounds by Meraz v. State, 785 S.W.2d 146,
155 (Tex. Crim. App. 1990). Van Guilder had previously been diagnosed as
schizophrenic. She burst through the doors of two separate apartments, one after the
other, yelling, “You’re gonna pay, you killed her,” and “You killed her, and you’re
gonna pay for it”; whereupon, she shot five people, killing one, then threw her pistol
away and fled. Van Guilder, 709 S.W.2d at 182. She was apprehended close to the
scene after jumping or falling off an embankment onto the apron of an interstate
highway. Id. She explained to the police at the hospital where she was taken that
someone told her she had to save the children; “They were hurting the children. I had
to stop it.” Id. at 183. At trial, Van Guilder testified that she believed she was
jogging in a race like that in the movie “Chariots of Fire” and she believed she was
being followed by a “big green car with a fat lip.” Id. Five medical experts testified
that Van Guilder was insane at the time of the offense; and the State produced no
rebutting evidence. Id.
          The jury acquitted Van Guilder of murder and three of the attempted murders
on the basis of insanity, but found her guilty on one count of attempted murder. Id.
at 184. The court of appeals reversed the conviction on the ground that the jury
finding was against the great weight and preponderance of the evidence, and the
Court of Criminal Appeals affirmed, despite raising the standard of review to a very
deferential “no evidence” standard, which the Court of Criminal Appeals
subsequently overruled in Meraz because it found the standard too high.


 Van
Guilder, 709 S.W.2d at 179, 183; Meraz, 785 S.W.2d at 155.



          In an eloquent concurrence in Van Guilder, Justice Teague explained why the
State erred in suggesting that, regardless of the quality or quantity of the evidence on
the affirmative defense of insanity, a reviewing court could not disturb the jury’s
guilty finding.
This is simply not the law of this State, and has never been the
law of this State . . . .
 
[W]hen an accused person presents any affirmative defense, he or she
has the burden to establish that defense by a preponderance of the
evidence. Once the accused person has satisfied that burden, and the
State controverts or rebuts such defense, it then becomes the
responsibility of the trier of fact to make the determination whether the
accused person established his defense by a preponderance of the
evidence. If the evidence is uncontroverted, as it was here, there is
nothing for the trier of fact to decide, and the trial judge should instruct
the jury to return a verdict of not guilty because of the uncontradicted
and uncontroverted affirmative defense.
 
Under our present law, the State has no burden to negate or
disprove any affirmative defense, such as insanity. Nevertheless, and
contrary to what occurred in this case, it must not sit idle if the accused
person presents an affirmative defense by credible evidence.
 
. . . .
 
In this instance, there is simply no testimony, either medical or
lay, from which any rational trier of fact could conclude that the
appellant was sane at the time of the offense. It is now axiomatic that
a jury that totally disregards credible and uncontradicted evidence
cannot be considered to have acted as a rational trier of fact. 

709 S.W.2d at 183-85 (Teague, J., concurring) (emphasis added).
          Even applying the more deferential ‘no evidence’ standard of proof of insanity
adopted by the Court of Criminal Appeals in Van Guilder—and subsequently
overruled as too high a standard in Meraz—I would still find that appellant proved
his insanity defense and that the trial court’s finding that he did not is not only so
against the great weight and preponderance of the evidence as to be clearly wrong,
but such that no rational fact-finder could have found appellant sane and therefore
guilty beyond a reasonable doubt. As the authorities cited above make clear, the
finder of fact is not free, as the majority asserts, to “believe or disbelieve experts or
lay witnesses as it chooses.” Its discretion is limited to reasonable inferences; and
it may not arbitrarily disregard expert testimony when it is unrebutted and
uncontroverted. Graham, 566 S.W.2d at 950, 952, n.3; Van Guilder, 709 S.W.2d at
185 (Teague, J., concurring).
          The majority’s quotation from Graham, 566 S.W.2d at 951, stating that a 
“doctors’ conclusions in terms of the statutory defense . . . are of negligible weight
in considering this issue,” i.e., the ultimate issue of sanity or insanity, is, in my view,
misleading. As the context of the quotation from Graham makes clear, the doctors’
conclusions to which reference was being made in that case were conclusions drawn
by the defendant’s doctors six months before the offense, at which time his condition
was in remission, and eighteen days after the offense, “when appellant was charged
with a serious offense, and no doubt was under a considerable degree of stress from
the proceedings against him.” Graham, 566 S.W.2d at 951. The court stated, “It
cannot be said as matter of law that the diagnosis in late September and October may
be projected back to the offense and held conclusive as to that date. Also, as the
doctors testified, schizophrenia is characterized by remissions and recurrences that
come at irregular and unpredictable intervals.” Id. The court concluded that the
experts’ “conclusions in this case are not shown to rest on anything more than a
general deduction from the diagnostic classification of appellant as schizophrenic.” 
Id. These expert conclusions in Graham were of little weight because they rested on
nothing more than “a general deduction” from the classification of the appellant as
schizophrenic rather than on the examination of the defendant near the time of the
offense or based on the actual circumstances of the offense, as here.
          Nothing could be further from the expert (and lay) testimony in this case,
detailing appellant’s previous history of mental illness, his bizarre behavior and
“crazy look at the time of the offense, his psychotic episode two days after the”
offense, and his interview with Dr. Laval in the psychiatric hospital to which he was
thereupon committed. The insanity report not only explains appellant’s mental state,
but accords perfectly with the behavior visible on the videotape of the offense, as well
as with the testimony of the only eyewitness who testified, the complainant. In short,
the expert testimony in this case is not conclusory or irrelevant, but highly probative
of appellant’s mental state at the time of the offense; and the circumstances, which
the Court of Criminal Appeals held in Graham “are always important in determining
the mental state of the accused at the commission of the offense,” likewise evidence
only appellant’s insanity. 566 S.W.2d at 951.
          Finally, the majority overreads the quotation, taken from Graham, that
“[o]pinion testimony does not establish material facts as a matter of law.” Graham,
566 S.W.2d at 951(quoting Muro v. Houston Fire & Cas. Ins. Co., 329 S.W.2d 326
(Tex. Civ. App.—San Antonio 1959, writ ref’d n.r.e.)). The context explains the role
of the expert: “The expert witnesses—psychiatrists and psychologists—are called to
adduce relevant information concerning what may for convenience be referred to as
the ‘medical’ component of the responsibility issue,” but the decision on the ultimate
issue of legal responsibility goes beyond that, “intertwining moral, legal, and medical
judgments.” Graham, 566 S.W.2d at 950 (quoting United States v. Brawner, 471
F.2d 969, 982-83 (D.C. Cir. 1972)). 
          In my view, Graham does not state or imply that unrebutted and
uncontroverted expert testimony is insufficient to establish that a defendant, as a
result of mental disease or deficit, could not differentiate between right and wrong at
the time of the offense, in the absence of contravening evidence. But even if the
majority is correct, and expert testimony may be utterly disregarded by the trier of
fact and utterly disregarded on appellate review of factual sufficiency of the evidence,
even when it is based on a contemporaneous insanity report by an experienced
psychiatrist employed by the State, the overwhelming preponderance of the evidence
of this case, both from lay testimony and the tape of appellant’s actions, would still
show appellant’s insanity at the time of the offense. The review would, however, no
longer be neutral, but weighted against the defendant.
          Here, appellant properly established his insanity defense through the insanity
report and expert testimony of Dr. Laval, evidence corroborated by the videotape and
by the complainant’s testimony. That evidence was entirely uncontroverted and
unrebutted by either expert or lay testimony. Nothing in the circumstances indicates
that appellant was sane at the time of the offense. Under these circumstances, the trial
court plainly erred in rejecting the insanity defense; and the majority compounds the
error by creating a standard of review of insanity under which expert testimony,
regardless of the facts on which it is based, is of “negligible” value and the finder of
fact is free to disregard all credible and unrebutted evidence on the issue of insanity
if it so chooses. The standard of proof of insanity and the standard of review
employed by the majority are both much higher than those established by law and
precedent.
          How we conduct our review of this case is critical because, when an
intermediate appellate court examines all of the evidence concerning an affirmative
defense like insanity, and then determines whether the finder of fact could have found
that a defendant failed to prove his defense by a preponderance of the evidence, it is
exercising its factual sufficiency jurisdiction—jurisdiction which the Court of
Criminal Appeals is barred from exercising by Article V, section 6 of the Texas
Constitution. Meraz, 785 S.W.2d at 154-55. Our decision on the factual sufficiency
of the evidence supporting an affirmative defense of insanity is conclusive. Id. at
155. It is essential, therefore, that we employ the standard of proof called for by law
and not establish our own, higher standard, which is so deferential to the finder of fact
as to amount to no review at all. Accordingly, I would reverse the judgment and
remand the cause to the trial court.



 
                                                                                  /s/ Evelyn V. Keyes
                                                                                  Justice
 
Panel consists of Justices Hedges, Keyes, and Duggan.


 

En banc consideration was requested.
 
A majority of the justices of the Court voted to consider the case en banc.
 
The en banc Court consists of Chief Justice Radack and Justices Hedges, Taft,
Nuchia, Jennings, Keyes, Alcala, Hanks, Higley, and Duggan.
 
Justice Hedges, writing for the majority of the en banc Court, joined by Chief
Justice Radack and Justices Taft, Nuchia, Jennings, Alcala, Higley, and Hanks.
 
Justice Keyes dissenting, joined by Justice Duggan.
 
Publish. Tex. R. App. P. 47.2(b).